FILED
Clerk
District Court

AUG 23 2013

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS**

UNITED STATES OF AMERICA,

                                Plaintiff,

                v.

CHANG RU MENG BACKMAN,

                                Defendant.

Case 1:12-CR-00015

DECISION AND ORDER DENYING MOTION
FOR JUDGMENT OF ACQUITTAL AND
DENYING REQUEST FOR NEW TRIAL

I.     **INTRODUCTION**

A jury found Defendant Chang Ru Meng Backman ("Defendant") guilty of one count of sex trafficking by force, fraud, or coercion. Before the Court is Defendant's Motion for Judgment of Acquittal as to Jury Verdict for Count II, Xiunan Li ("Motion," ECF No. 166). The motion also includes a request, in the alternative, for a new trial. Defendant primarily attacks the sufficiency of the evidence. She also asserts that it was error for the court to give a deadlocked-jury charge. The Government filed an opposition (ECF No. 167), and Defendant filed a reply (ECF No. 167). The matter came on for a hearing on August 23, 2013. Having carefully considered the parties' oral and written presentations, the Court now decides the motion in favor of the Government.

II.     **PROCEDURAL HISTORY**

On May 29, 2012, the grand jury returned an indictment charging Defendant with three counts of sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a)(1), and three counts of harboring illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). The grand jury returned a superseding indictment

1

on July 31, 2012, charging Defendant with the three sex-trafficking counts and one count of making a false statement in an immigration document, in violation of 18 U.S.C. § 1546(a). On December 3, the Court granted the Government's motion to dismiss the false-statement charge.

On May 20, 2013, a jury trial commenced on the three sex-trafficking counts. In the superseding indictment, the Government alleged that Defendant operated the New Holiday Club (the "Club"), a karaoke bar that also provided sexual services for a fee; that Defendant received money from customers of the Club for sexual services performed by three women – identified by the initials Q.H. (count 1), X.L. (counts 2), and D.Z. (count 3) – at Defendant's direction, generally in rooms where the women lived in a barracks next to the Club procured by Defendant; that Defendant provided the women with condoms, received money from customers, and on occasion transported the women to and from the Club to various locations in Saipan, Commonwealth of the Northern Mariana Islands (the "Commonwealth"), to engage in sex acts with customers at Defendant's direction. The Government further alleged that in August 2008, the three women were induced to travel to the Commonwealth by promises, made by unnamed persons, of employment at a hotel or farm in Saipan, and instead were compelled to work as prostitutes until sometime in March 2009.

The trial lasted about two weeks. All three of the alleged victims testified, as did one customer, Peter Leau. On June 3, after the Government rested its case in chief, Defendant made an oral motion for judgment of acquittal; the Court ruled from the bench and denied the motion. On June 4, the parties made closing argument and, at 2:10 p.m., the case was submitted to the jury. At 4 p.m., the jury foreperson sent the Court this note: "Jurors would like to get a clarification as to the definition of a "UNANIMOUS DECISION"[:] are we to vote individually and choose the highest voted decision, or are we to all come to just one solid decision as a whole?" (ECF No. 155.) The Court responded in writing: "Unanimous decision means everyone must reach the same decision as to each count. You are reminded that you must decide each count separately." (*Id.*) The jury continued deliberating until 4:45 p.m., at which time they were sent home for the evening after receiving

the standard admonishment. On June 5, the jury deliberated all day without reaching a verdict. At 4:40 p.m., the Court admonished the jurors and instructed them to return the next morning to resume deliberation at 8 a.m.

On June 6, shortly before 11 a.m., the Court received the following note (ECF No. 156) from the foreperson: "After a very serious and difficult deliberation, we jurors have come to a divided decision. We are unable to unanimously choose a verdict in this case. We do not want to prolong the time of this trial in respect to all parties. We respectfully request you accept our decision, and humbly extend our sincerest apologies." The note was signed by all twelve jurors. The Court conferred with counsel for both parties and indicated it was inclined to give the Ninth Circuit's model deadlocked-jury charge (sometimes called an *Allen* charge). The Government agreed that the deadlocked-jury charge should be given. Initially, Defendant objected to giving the charge and asked the Court to declare a mistrial. However, when Defendant was told that the case would be reset for trial and she would not be freed from her pretrial release conditions, she withdrew her objection to the deadlocked-jury charge. Also, Defendant did not object to any of the language in the proposed charge. Just before 1 p.m., the Court recalled the jurors to the courtroom and read to them verbatim the Ninth Circuit's Model Criminal Jury Instruction 7.7 (2010 ed.). The jury then continued its deliberations. At 2:25 p.m., the foreperson sent a note inquiring into the relation of the bank checks in evidence to the "affecting interstate or foreign commerce" element of the offense. After conferring with counsel for the parties, the Court instructed the jurors in writing to "remember the facts as you recall them, and follow the instructions on the law as I have given them to you." (*See* ECF No. 157-1.) The jurors were sent home for the evening after receiving the standard admonishment.

On June 7, after nearly three hours of deliberation that morning, the foreperson sent a note saying that the jurors "have all reached a unanimous decision/verdict." (*See* ECF No. 159-1.) The jury found Defendant

not guilty of counts 1 and 3, and guilty of count 2. The jurors were polled individually, and each juror affirmed that this was his or her verdict.

### III.    LEGAL STANDARDS

Under Rule 29(c)(2) of the Federal Rules of Criminal Procedure, upon timely motion of the Defendant the Court may set aside a jury's guilty verdict. A Rule 29 motion should be denied if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Riggins,* 40 F.3d 1055, 1057 (9th Cir. 1994) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (original emphasis)). Furthermore, "all reasonable inferences are to be drawn in favor of the government, and any conflicts in the evidence are to be resolved in favor of the jury's verdict." *See United States v. Alvarez-Valenzuela,* 231 F.3d 1198, 1201–2 (9th Cir. 2000).

The district court may vacate the judgment and order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The court's power to order a new trial is "much broader than its power to grant a motion for judgment of acquittal." *United States v. Alston,* 974 F.2d 1206, 1211 (9th Cir. 1992). Rather than having to view the evidence in the light most favorable to the verdict, the court may "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Id.* (quoting *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir. 1980)). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id.* at 1211–12 (quoting *Lincoln,* 630 F.2d at 1319). The power to grant a new trial on the basis of insufficient evidence "should be invoked only in exceptional cases in which the evidence preponderates against the verdict." *United States v. Pimentel,* 654 F.2d 538, 545 (9th Cir. 1981) (internal quotation marks omitted).

4

## IV.    DISCUSSION

### A.    Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence to convict her of trafficking X.L. for sex. It was the Government's burden to prove (1) that Defendant (a) knowingly recruited, enticed, harbored, transported, provided, or obtained X.L., or (b) knowingly benefited, financially or by receiving anything of value, from participation in a venture that recruited, harbored, transported, provided, or obtained X.L.; (2) that Defendant knew or recklessly disregarded the fact that means of force, fraud, or coercion would be used to cause X.L. to engage in a commercial sex act; and (3) that Defendant's acts were in or affecting interstate or foreign commerce. *See* 18 U.S.C. 1591(a).

Defendant asserts a lack of evidence that a customer of the Club used force, fraud, or coercion to obtain sex from X.L. or that Defendant knew or should have known a customer would do so. This argument is without merit. The second element of the offense does not require that the person doing the forcing be the customer. The question is not whether X.L. consented to having sex with a particular customer, but whether she consented to work as a prostitute. The jury only needed to have sufficient evidence to conclude that somebody – whether Defendant herself or someone else – had forced, defrauded, or coerced X.L. into the sex trade, and that Defendant knew or should have known this was so. In *United States v. Change Da Liu*, 538 F.3d 1078, 1081–82 (9th Cir. 2008), evidence showed that the defendant used false promises to induce Chinese women to pay a $6,000 fee to travel to Saipan to work as work as waitresses, only for them to find when it was too late that they were required to have sex with customers. This evidence was sufficient to support conviction on sex-trafficking charges, without any showing that force, fraud, or coercion was used by the customers themselves. *See id.* at 1085.

In this case, ample evidence came out at trial to support the jury's verdict. X.L. testified that she paid a man in China RMB 70,000 (over $10,000) to arrange for her to come to Saipan. X.L. expected to be put to

work on a farm or in a hotel. Unknown to her, the visa that her recruiters secured for her was a tourist visa, not a work visa. Within twenty-four hours of her arrival on Saipan, X.L. was brought to the Club, where she was told by a woman named Xiaolin Song in the presence of Defendant that she would have three duties: sit with the customers, drink with the customers, and sleep with the customers. At the Club, Song introduced X.L., Q.H., and D.Z. to Defendant, whom X.L. referred to as the "boss lady." Defendant brought the three women skimpy outfits to wear on the job, directed X.L. to her room and told her to clean it. Defendant showed the women the bar room where they would be working. Defendant described the "companion services," including sex, that the women would be expected to provide customers.

Defendant charged X.L. $100 a month for rent; also, X.L. had to pay for her own living expenses. X.L. was not allowed to go outside during the day. After work ended at 4 a.m., Defendant would escort X.L and the other women to a 24-hour store to buy groceries. Defendant told the women that Saipan was a dangerous place. She told them a story about a child who wandered off from her family and was later found hanged from a tree. She told them that if they went out on the streets by themselves they would be shot by locals. She told X.L. she was old and ugly: if she left the Club, who else would want her? X.L. came from a poor rural family. She had completed only four years of school and had worked on farms since she was thirteen. She was in her late thirties when she was recruited to come to Saipan on the promise of earning money legitimately to send back to her family. She did not speak English and knew nothing about Saipan beside what Defendant told her. She was terrified to leave the Club.

Initially, X.L. refused to have sex with customers. About two weeks after she started working at the Club, Defendant told X.L. to service a Filipino man who was one of the Club's steady customers. She gave X.L. a condom and directed her to take off all her clothes when she got to the bedroom. The customer pulled X.L.'s head down to indicate she should perform oral sex on him. Later the same evening, the customer returned to the Club and had sexual intercourse with X.L. Afterward, he paid Defendant to have X.L. come

spend the night at his house. Defendant drove X.L. there and told her she would come back and pick her up in the morning. She gave X.L. two condoms. In the house, the man pulled X.L.'s clothes off and tried to have sex with her, but he could not maintain an erection. Instead, he vaginally penetrated her with a vibrator and assaulted her with the device for at least 30 minutes. X.L. was in pain and cried. The door was locked and she could not leave. Defendant came by for her in the morning.

On another occasion, Defendant drove X.L. to a hotel to stay overnight with a heavyset customer named Peter, a school principal whom X.L. referred to as the "fat principal." Defendant provided X.L. with condoms. X.L. and Peter had sex. She did not want to have sex with Peter and, she testified, would rather have died. In the morning, Peter gave X.L. a check, which X.L. later passed along to Defendant. Between August 2008 and March 2009, X.L. had sex with Peter three or four times. A man named Peter Leau testified that during that period, he paid for sex with women from the Club. He testified that most of the time he paid by personal checks, which he would make out in Defendant's name and give to the women. Nine personal checks from Peter Leau made out to Defendant were entered into evidence.  All of them were drawn on a bank that processed them in Hawaii.

Peter and the Filipino man were not the only customers X.L. had sex with during her seven months at the Club. X.L. testified that she typically had sex with two or three customers a week. The Club was open seven nights a week, and sometimes X.L. would sleep with a customer every night.

Viewed in the light most favorable to the prosecution, this record supports a reasonable conclusion that Defendant herself coerced X.L. to have sex for money, by drawing a picture of the horrible fate that awaited her on the streets of a hostile Saipan if she tried to leave the Club and by pimping her out to paying customers without her consent. It also supports a reasonable conclusion that Defendant knew or recklessly disregarded the fact that X.L. had been defrauded when she was recruited in China to come to work on Saipan. During her first two weeks at the Club, X.L. resisted having sex with customers. The jury might

reasonably infer from Defendant's behavior in response to this resistance that Defendant was aware X.L. had not expected to be put to work as a prostitute. Therefore, the motion for judgment of acquittal on grounds of insufficient evidence must be denied.

The request for a new trial on those same grounds of evidentiary insufficiency must also be denied. It does no manifest injustice to uphold the jury's verdict based on the trial record. This is not the exceptional case where the evidence preponderates against conviction. The fact that the jury acquitted on the counts with respect to Q.H. and D.Z. while convicting with respect to X.L. raises the possibility of inconsistent verdicts. It is well established, however, that "inconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict." *United States v. Birges,* 723 F.2d 666, 673 (9th Cir. 1984) (cited in *United States v. Suarez,* 682 F.3d 1214, 1218 (9th Cir. 2012)). Moreover, it is far from certain that these verdicts are inconsistent. The jury may have found X.L.'s testimony that she did not know she was coming to Saipan to engage in prostitution more credible than Q.H.'s and D.Z.'s, based on differences in the personal backgrounds of the three women as well as their demeanor on the stand.

Defendant points out that in a letter the three women wrote to the Government in May 2009 asking for help to extricate themselves from their situation at the Club, they did not name Defendant as among the "gang of snakeheads" who had deceived them and were oppressing them. Defendant asserts that the omission of her name from the letter, when other persons involved in the sex-trafficking scheme were named, directly conflicts with the three women's testimony that painted Defendant as a devil. Defendant contends it shows that X.L. and the other two women fabricated testimony against her in order to please the Government and gain immigration benefits, in the form of permits to work on Guam.

Although Defendant's version of events is plausible, it is not the only rational conclusion that the jury could have drawn. It may be reasonably inferred that at the time the women wrote the letter, they considered

8

the persons they named to be the most culpable and most dangerous – the ringleaders, so to speak. Moreover, even if at the time the letter was written, in May 2009, X.L. subjectively did not believe Defendant had acted criminally, that belief would not and should not control whether a jury, viewing all the evidence objectively, finds Defendant guilty as charged.

  For these reasons, the motion for a new trial on grounds of insufficiency of the evidence must be denied.

**B.  Deadlocked-Jury Charge**

  Defendant asserts that the jurors were unjustly forced to render a verdict after they had resolutely declared they were unable to reach a unanimous verdict. In effect, Defendant alleges that the guilty verdict against her was coerced.

  A criminal defendant is entitled to an uncoerced jury verdict. *See Lowenfield v. Phelps,* 484 U.S. 231, 241 (1988). However, "a supplemental charge to encourage a deadlocked jury to try to reach a verdict is not coercive per se." *Parker v. Small,* 665 F.3d 1143, 1147 (9th Cir. 2011) (citing *Allen v. United States,* 164 U.S. 492 (1896) (approving so-called *Allen* charge)). In evaluating whether a particular deadlocked-jury charge was coercive, courts consider "(1) the form of the instruction, (2) the time the jury deliberated after receiving the charge as compared to the total time of deliberation, and (3) any other indicia of coerciveness." *United States v. Freeman,* 498 F.3d 893, 908 (9th Cir. 2007) (citing *United States v. Daas,* 198 F.3d 1167, 1179–80 (9th Cir.1999).

  The supplemental charge given to Defendant's jury was not coercive. Word for word, the Court read to the jurors the Ninth Circuit's model instruction for deadlocked juries. That instruction does not single out minority holdouts, but encourages all jurors, whether in the majority or minority, to reexamine their views. It affirms that the Court has no interest in forcing unanimity where in good conscience none is to be had: "[Y]ou should not change an honest belief as to the weight or effect of the evidence solely because of the opinions of

your fellow jurors or for the mere purpose of returning a verdict." Ninth Circuit Model Criminal Jury Instruction 7.7 ("Deadlocked Jury") (2010 ed.). The jury's note saying they were deadlocked did not indicate which verdict commanded a majority of jurors, the number of minority holdouts, or the identity of the holdouts. The Court did not inquire into any of those matters. The jury had been deliberating only a day and a half when they declared themselves deadlocked. After the supplemental instruction was given, they deliberated a further seven hours before reaching a verdict. During that time, they sent out a note asking for clarification on the interstate/foreign commerce instruction. The length of deliberation and the nature of the final jury note strongly indicate that the jurors were following the instruction to reexamine their views in good faith. In total, these circumstances do not suggest that the unanimous guilty verdict against Defendant was coerced.

## V.    CONCLUSION

For the foregoing reasons, Defendant's motion for judgment of acquittal or alternatively a new trial is DENIED.

SO ORDERED this _23rd_ day of August, 2013.

RAMONA V. MANGLONA
Chief Judge